**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0928-20

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FERNANDO CARRERO, JR.,
a/k/a FIPO,

    Defendant-Appellant.

_____

Submitted September 25, 2024 – Decided July 24, 2025

Before Judges Marczyk, Paganelli, and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 08-10-1706.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Amira R. Scurato, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Just after midnight on November 7, 2007, Lyndhurst police responded to a 9-1-1 call for an ambulance to the family home of Kerilynn Lowenstein,[1] defendant Fernando Carrero, Jr.'s then-girlfriend. Police arrived and found the victim, Jose Hall, moaning and lying on the kitchen floor, in a pool of blood, with gunshot wounds to the head and torso. Hall was transported to the hospital where he succumbed to his injuries two days later. Police spoke to witnesses at the scene and learned defendant was the shooter.

Defendant, then-one month shy of his eighteenth birthday, was arrested later that same morning, in possession of the gun later matched to the shooting, which the police found in a duffel bag, feet away from him. After waiver of jurisdiction to the Law Division for trial as an adult, an indictment followed charging defendant with first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2) (count one); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); third-degree possession of a firearm without a permit, N.J.S.A. 2C:39-5(b) (counts three and five); and third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1) (count four).

---

[1] We refer to Kerilynn Lowenstein by her first name to avoid confusion because her parents who share the same last name were also trial witnesses.

Defendant raised self-defense, claiming he and Hall—acquainted through Kerilynn—were arguing when Hall pulled out a gun, and, as the two struggled, the gun went off striking Hall. The State, however, theorized that defendant, motivated by intense jealousy regarding Kerilynn's relationships with other men, shot an unarmed Hall—first in the torso wounding him, and then a second time, mortally, in the head—as Hall writhed on the floor defenseless. The State moved successfully pretrial to admit evidence of defendant's prior history of possessive, controlling, and physically abusive behavior toward Kerilynn. The court also admitted statements made by defendant to police at and around the time of his arrest connecting him to the gun.

A jury convicted defendant on all counts after his first trial in 2013, but we reversed the conviction on appeal and remanded for a new trial, finding defendant was improperly denied a jury instruction on passion/provocation manslaughter. See State v. Carrero, No. A-5304-12 (App. Div. June 10, 2016) (slip op. at 23). The Supreme Court affirmed the reversal on those grounds. See State v. Carrero, 229 N.J. 118, 131 (2017).

On remand, a new judge presided over pretrial motions, trial, and sentencing. After retrial, during which defendant's statements and testimony regarding his controlling and abusive relationship with Kerilynn were again

A-0928-20

admitted, a jury convicted defendant of all charges for a second time. At sentencing, the court, after merging count two into count one, sentenced defendant to life imprisonment subject to parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, for murder, and imposed four-year terms on the remaining counts to run concurrent to each other and consecutive to the life sentence.

On appeal, defendant presents the following challenges to the trial and sentence:

POINT I

THE COURT ERRED IN ADMITTING EVIDENCE, ON THE GROUND THAT IT WAS AN EXCEPTION TO N.J.R.E. 404(b), THAT DEFENDANT FREQUENTLY BEAT UP HIS GIRLFRIEND, WHICH HAD NO BEARING ON ANY MATTER AT ISSUE AND SERVED NO PURPOSE OTHER THAN TO INVITE THE JURY TO INFER THAT HE HAD AN AGGRESSIVE DISPOSITION SO AS TO UNDERMINE HIS CLAIM THAT HE ACTED IN SELF-DEFENSE OR THAT THE VICTIM WAS THE AGGRESSOR AND THE GUN WENT OFF IN A STRUGGLE AGAINST A MUCH LARGER MALE.

POINT II

THE DOUBLE-HEARSAY TESTIMONY ABOUT WHAT THE VICTIM TOLD A WITNESS ABOUT HIS CONVERSATION WITH DEFENDANT CONSTITUTED UNRELIABLE DOUBLE

4

HEARSAY AND DID NOT MEET ANY EXCEPTION
TO THE RULE EXCLUDING HEARSAY.

POINT III

DEFENDANT'S ALLEGED STATEMENT ABOUT
OWNERSHIP OF THE GUN, AND THE GUN
ITSELF, SHOULD HAVE BEEN EXCLUDED
BECAUSE THEY WERE OBTAINED IN
VIOLATION OF HIS CONSTITUTIONAL RIGHT
TO REMAIN SILENT.

POINT IV

THE JUDGE'S FAILURE TO VOIR DIRE THE JURY
AFTER A JUROR CALLED CHAMBERS POST-
VERDICT WAS CLEAR ERROR REQUIRING
REVERSAL.

POINT V

THE STATE'S SUMMATION VIOLATED
DEFENDANT'S RIGHT TO REMAIN SILENT.

POINT VI

THE CUMULATIVE IMPACT OF THE ERRORS
DENIED DEFENDANT A FAIR TRIAL.

POINT VII

THE TRIAL JUDGE'S FAILURE TO PROPERLY
CONSIDER DEFENDANT'S YOUTH IN
MITIGATION TOGETHER WITH OTHER
SENTENCING ERRORS REQUIRES THAT A
REMAND FOR RESENTENCING BE ORDERED.

Defendant's supplemental brief raises the following argument:

5

THE TRIAL COURT ERRED IN ALLOWING THE TESTIMONY OF STATE POLICE [LIEUTENANT] JAMES RYAN OF THE BALLISTICS UNIT BECAUSE [LIEUTENANT] RYAN'S TESTIMONY WAS CONFRONTATIONAL VIOLATING CRAWFORD V. WASHINGTON, 541 U.S. 36 . . . [(2004)].

Following a thorough review of the record under controlling legal principles, and unpersuaded by defendant's arguments that he was deprived of a fair trial and improperly sentenced, we affirm.

I.

A. The Pretrial Motions

On June 8, 2018, on remand for a new trial, the court heard arguments regarding defendant's request to re-litigate several of the pretrial motions admitting pivotal evidence before defendant's first trial. Specifically, defendant challenged decisions by the prior motion judge, which resulted in the admission at trial of: (1) the handgun used to murder Hall seized at the time of defendant's arrest; (2) N.J.R.E. 404(b) evidence regarding defendant's abusive and controlling behavior toward Kerilynn; (3) defendant's various pre- and post-Miranda[2] statements to police; and (4) a statement by Hall related to a conversation with defendant. See Carrero, slip op. at 3.

_____

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

6

The trial court determined that the law-of-the-case doctrine precluded re-litigation of three of the four prior motion rulings: denying defendant's motion to suppress the gun; allowing the State to present prior bad acts evidence concerning defendant's prior abuse of Kerilynn and jealousy of others; and admitting hearsay testimony from Kerilynn about a conversation Hall told Kerilynn he had with defendant during which Hall tried to quell tensions. The court granted defendant a new <u>Miranda</u> hearing and an opportunity to supplement the prior motion record, after which the court found all defendant's statements admissible at trial.

The following synthesizes the extensive record of the relevant motions before both the first and second trials, as well as the record from the second trial and sentencing.

### 1. <u>Motion to Suppress/Miranda</u>

Prior to the first trial, defendant moved to suppress the gun seized at the time he was arrested and statements he made to police at various stages while in police custody. The first motion judge heard testimony at a combined hearing on both motions, and by order dated January 7, 2010 and oral decision: (1) denied the motion to suppress the gun under the Fourth Amendment of the United States Constitution and Article 1, Paragraph 7 of our State Constitution

7

based on consent to search by the homeowner; and (2) found admissible all statements defendant made to police pre- and post-<u>Miranda</u> warnings under the public safety exception to <u>Miranda</u>'s safeguards. On remand, the second trial court adopted the prior motion court's decision denying suppression of the gun, but granted a new hearing regarding the admissibility of defendant's statements.

As it had before, the State sought to admit four distinct statements by defendant. Three statements were made while defendant was in custody but prior to the administration of <u>Miranda</u> warnings: (1) defendant's non-verbal head nod toward the location of the gun in response to police inquiring about the gun; (2) defendant's statement in response to the police asking if anything else in the bag was his, stating, "Nothing but the gun and that's it"; and (3) his statement during transport when police informed him they wanted to question him about "a shooting" and he stated, "I don't know anything about it." The State also sought to admit defendant's formal statement to police post-<u>Miranda</u> warnings, during which he again admitted the gun was his before he invoked his rights, as prompted by his mother who was also present. The following summarizes the largely undisputed evidence adduced at both hearings.[3]

---

[3] At the first hearing, the State presented testimony from Newark Police Department Fugitive Apprehension Team (NFT) Detectives Anthony Lucarelli

On November 7, 2007, at approximately 12:19 a.m., the Lyndhurst Police Department responded to the 9-1-1 call regarding the shooting. They arrived at the Lowenstein family home, where Kerilynn resided with her parents, Maryann and Dean, and her ex-boyfriend Corey Hicks. The Lowensteins allowed Hicks, who was close friends with Hall, to live in a downstairs apartment in their home. While emergency medical responders transported a badly wounded but still breathing Hall to the hospital, Kerilynn, who witnessed the shooting, told police defendant shot Hall and fled on foot. The police did not find the gun at the scene. The police learned defendant's last known address in Newark and contacted the Newark Police Department for assistance in locating and apprehending defendant.

At approximately 5:00 a.m., roughly nine detectives from the NFT met to review the information received from the Lyndhurst Police Department and commenced the search for defendant. Not finding defendant at his last known address where his stepfather confirmed defendant had not been, the team went

and Norberto Soares, Bergen County Prosecutor's Office (BCPO) Homicide Unit Detectives Keith Delaney, James Frank Brazofsky, and Lyndhurst Police Department Lieutenant Patrick Devlin. Defendant presented testimony from defendant's sister and stepfather. On remand, the trial court held supplemental hearings and took testimony on three separate dates. The State presented testimony from Detective Delaney, and defendant presented testimony from Detective Soares, Detective Lucarelli, and Detective Brazofsky.

to the home of defendant's sister, Marlene Ortiz, who disclosed that defendant was at her ex-boyfriend James Ortiz's[4] apartment, located in a multi-family house with two apartments in Orange. Marlene testified she told the officers that defendant called her "crying" earlier that morning and asked for money because he wanted to "leave the area" and had "d[one] something wrong." She explained that she accompanied police to look for her brother because police "told [her she] had to . . . go with them," although she had given a prior statement indicating that she voluntarily joined the search.

At approximately 7:30 a.m., the NFT, with Marlene, arrived at James's apartment, where he lived with his mother, Edith Thompson. NFT Detective Lucarelli testified that he knocked on the door, James answered, and the detective explained that they were conducting an investigation and needed to speak with defendant. According to the detective, James told them that defendant was there and invited them inside.

Detective Lucarelli described finding defendant sitting on a couch appearing "excited." Detective Lucarelli walked to defendant, physically raised him off the couch, and asked his name. When defendant identified himself, the

---

[4] We refer to Marlene Ortiz and James Ortiz by their first names to avoid confusion because they share the same last name.

detective patted down defendant, handcuffed his hands behind his back, and placed him back on the couch, "standing over the top of him" while they remained in the apartment. Defendant cooperated and did not resist or threaten any of the police officers. Three additional officers simultaneously "conduct[ed] a sweep" for other persons in the area and "secured" the apartment. James, his mother, and Marlene remained in the kitchen, while the remaining NFT officers "secur[ed] the outside perimeter." It was undisputed that defendant was in custody and not free to leave.

NFT Detective John Rodriguez then asked defendant, "Are there . . . any weapons in the house[?]" According to Detective Lucarelli, defendant "put his head down and moved his head towards the left direction" and "nodded to his left." Approximately five or six feet away from defendant, a black duffel bag sat on the floor at the end of the couch.

NFT Detective Norberto Soares testified that he approached the "open" duffel bag, and without touching it, he could see another bag inside. He described the interior bag as "a white shopping bag that [wa]s somewhat transparent," and he could see through it the brown handle of a handgun. He announced to the other officers the presence of a gun, although it was not removed from the bag until BCPO detectives arrived and consent was obtained.

11

NFT Detective Soares testified that the outside of the residence was fully secured, and he did not think that defendant posed a danger. NFT officers removed certain personal property from defendant, including his belt, shoelaces, and cell phone, and placed them on the couch, while they awaited the arrival of the Lyndhurst police and BCPO investigators. Shortly after the additional officers arrived at around 9:00 a.m., BCPO Detective Keith Delaney informed defendant that he was going to take him to the Lyndhurst Police Headquarters. Detective Delaney testified and confirmed that defendant was in custody and had not been read his <u>Miranda</u> warnings.

BCPO Detective James Brazofsky testified that before police removed the gun from the duffel bag, he spoke to and obtained written consent from Edith Thompson—whom he understood was the "owner" or "renter" of the apartment—to search the apartment. He indicated she consented verbally and signed the written consent form; and, after obtaining Thompson's consent, the police removed the handgun from the duffel bag. The police also removed a plastic bag containing four .357 caliber bullets from the duffel bag, along with t-shirts and CDs. Photographs were taken of the duffel bag with the white bag and visible gun handle before the police removed the gun from it.

A-0928-20

While the police were preparing to transport defendant to the police station, Detective Delaney asked one of the officers to get defendant's personal property that was on the couch. He also asked defendant, "[I]s anything else in the bag yours[?]" Defendant responded, "Nothing but the gun, and that's it." Defendant then nodded to the phone on the couch and said, "And that phone."

Defendant was escorted out of the home and placed in the back of a police car. On the drive to Lyndhurst Police Headquarters, Detective Delaney told defendant that they were "bringing him to Lyndhurst, that [they] were in the middle of an investigation involving a shooting and [they] wanted to speak to him about that." Defendant stated, "I don't know anything about it." Defendant then asked Detective Delaney if his sister, Marlene, was going to be present at police headquarters. Detective Delaney told defendant that the police were trying to get in contact with his mother so she could meet them there and posed no questions to defendant.

At approximately 10:00 a.m., they arrived at the Lyndhurst police station, as did defendant's mother, Virginia Montalvo. Detective Delaney testified he told defendant's mother that the police were "investigating a shooting, th[at] [they] had just brought in her son, . . . and that [they] wanted to speak to him

13

about the incident." Montalvo accompanied defendant to the interview room and remained with him.

The interview commenced at 10:25 a.m. The detective read defendant his Miranda warnings from a juvenile Miranda rights printed form and asked defendant to read along, after which defendant indicated he understood his rights and wished to speak. Montalvo indicated that she wished to be present, both signed the form, and the interview began.

Defendant denied being at the Lowenstein home the night before. He claimed he had borrowed Kerilynn's car while she was at work. He said he went to "pick[] up [his] older brother, . . . went back to the hood, just stood there politicking until [he] had to pick [Kerilynn] up." He claimed he then picked Kerilynn up after work at 11:00 p.m., and he "told her to drop [him] off," which she did, in Newark. Defendant said that he then took the bus to James's apartment in Orange, arriving there before midnight.

The detective asked defendant, "[W]hy do you think you're here today . . . ?" Defendant responded, "I really don't know, that's what I want to know, why am I here?" He again denied knowing why he was being questioned, and said, "Well yeah, I can't even visit . . . Keri[l]ynn's house."

14

A-0928-20

When Detective Delaney asked defendant whether he had been at the Lowenstein house, defendant replied, "[N]o[,] I was sleeping." When asked if he had been at the house the day before, defendant responded, "Earlier. . . . Before I left my mother's house to eat. That's when [Kerilynn] picked me up[.] I had to work, she had to work in the afternoon."

Detective Delaney asked him, "[A]t the house in Orange[,] you directed police officers to a gun that was in a bag next to the couch is that correct?" Defendant responded, "I didn't direct nobody. They found it, I didn't direct nobody to nothing." Detective Delaney said to defendant, "[W]e asked you if anything else in that [duffel] bag was yours and you told me directly 'nothing but the gun.'" Defendant said, "Yeah, nothing but the gun." Detective Delaney then asked, "So the gun would be yours?" Defendant responded, "Yes[,] . . . [b]ut I didn't direct nobody to no gun." When Detective Delaney asked, "Alright[,] but the gun is yours?" defendant responded, "That's what I said."

Defendant's mother interjected, stating, "I think you need a lawyer," and "I don't think you should answer anymore questions." Defendant then responded, "I don't want to talk to you because I don't know what's going on.

A-0928-20

You came and picked me up for no reason. I wasn't doing nothing." Detective Delaney then terminated the interview.

In January 2010, the first motion judge denied defendant's motion to suppress his statements to police and the handgun in a joint oral decision. Regarding the statements, the judge first found that police were authorized to initially inquire about the gun under the public safety exception to the warrant requirement. The judge found the police witnesses were credible and the question was designed to protect their safety and that of others. The motion judge also found that defendant's statements that "nothing but the gun" was his when asked if anything else in the duffel bag belonged to him and that he "d[id not] know anything about [the shooting]" during transport to the police station did not result from interrogation. Finally, the judge found defendant's formal statement to police was constitutionally obtained, as police advised defendant and his mother of defendant's rights; and, free from coercion, and informed that the questioning involved "a shooting," defendant waived them.

In its 2019 written decision, the trial court again found all defendant's statements admissible. The court considered both records, first noting that it was "clear from the record" of the first hearing that the "motion was extensively litigated over the course of two days with testimony and oral argument," and

16

that the prior judge made credibility findings and reached its decision on the testimony and evidence. The court also considered the newly offered supplemental testimony and evidence and found the police witnesses were credible, making specific findings about their demeanor and the substance of their testimony.

Regarding defendant's non-verbal nod toward the gun, the court found the public safety exception permitted the limited police inquiry about whether there was a gun in the house. The court noted that the first officers to encounter defendant were from the NFT with a limited role of locating the shooting suspect—not to investigate the case or find incriminating evidence such as the gun.

The court cited controlling law, and found:

> As in [New York v. ]Quarles, [467 U.S. 649, 655 (1984),] the police officers, in the act of apprehending . . . defendant, were confronted with the immediate necessity of ascertaining the whereabouts of a gun that was alleged to have been used in the Lyndhurst shooting. The whereabouts of that weapon, unknown to the officers, posed a danger not only to the officers, but to the individuals in the home.

The court added:

> A firearm could have been hidden within the cushions where . . . defendant was sitting, within his reach, his movement hampered, but not completely impeded by

A-0928-20

handcuffs. There were two other individuals present who were not in custody. Locating any weapon was a paramount concern to protect the officers' and others' safety.

Accordingly, the court concluded that the detective had an "objectively reasonable need" to "protect himself, other officers, and other individuals present, from the danger a firearm posed to them, by asking . . . defendant the narrowly[] tailored question." The court determined that defendant's non-verbal response was admissible; thus, it had "no reason" to consider whether the gun should be suppressed on Fifth Amendment grounds, as there was no constitutional infirmity to asking whether the gun was in the house.

The court also found admissible defendant's statement that "nothing but the gun" belonged to him. It determined Detective Delaney's question whether anything else belonged to him was "ministerial" and came after Detective "Brazofsky held up [the] [t]-shirts and CDs." The court reasoned that the question was "reasonable," as defendant was not in his home and the inquiry was "designed to ascertain what property belonged to . . . defendant, and not designed to elicit an incriminating response."

The court also deemed defendant's formal statement admissible, rejecting the argument that the police should have informed both defendant and his mother of the details of the situation, not simply that there had been "a shooting." The

18

A-0928-20

court stated it "observed the videotaped interrogation," and found "defendant and his mother made a knowing, voluntary waiver of . . . defendant's rights. There were no coercive tactics used to elicit statements from . . . defendant or to have his mother consent to the interrogation." Further, the court found that when "defendant's mother invoked [defendant's] right to counsel, the officers promptly ceased all questioning."

Subsequently, the court denied defendant's motion for reconsideration.

As to defendant's motion to suppress the gun under the Fourth Amendment and the New Jersey Constitution, the first motion judge found the warrantless search and seizure of the gun was lawful pursuant to valid consent given by Thompson. The trial court on remand found the prior Fourth Amendment ruling to be the law of the case, and the gun was admitted at the second trial. Defendant does not challenge that ruling here.

### 2. Motion to Admit Prior Bad Acts Evidence

The trial court on remand adopted the prior motion judge's decision permitting the Rule 404(b) prior bad acts evidence. The State moved to admit the evidence, arguing defendant's controlling and jealous behavior regarding Kerilynn was admissible as intrinsic to the offense and for the non-propensity purposes of understanding defendant's motive and state of mind in shooting an

19

A-0928-20

unarmed Hall in the Lowensteins' kitchen over Hall's seemingly "benign" comments to Kerilynn. The State also sought to admit Kerilynn's testimony regarding a conversation between Hall and defendant weeks before the shooting, when Hall approached defendant about making peace for Kerilynn's sake.

The first motion judge held an extensive hearing, during which Kerilynn testified, subject to cross-examination. The testimony was detailed and spanned three days to allow the court to understand the nature of the relationship, although the State did not seek to admit all of the proffered evidence at trial. Kerilynn testified regarding numerous specific instances of defendant's emotional and physical abuse and controlling behavior, particularly as it related to defendant's jealousy of other men. She described many physical assaults, and continuous controlling conduct, with defendant monitoring her communications and restricting who she could speak to and where she could go. She also testified regarding threatening letters and calls from defendant urging her to "lie" and alter her prior statements to police.[5]

After the conclusion of this hearing, defendant pled guilty to first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a), and third-degree hindering

---

[5] Defendant was separately charged and convicted of second-degree witness tampering, N.J.S.A. 2C:28-5(a)(1), and related charges regarding these communications.

apprehension or prosecution, N.J.S.A. 2C:29-3(b)(1). In 2012, after defendant retracted his plea and the case was again pending trial, the judge granted the State's motion, finding the evidence was both intrinsic to the offense and satisfied the four-part test under State v. Cofield, 127 N.J. 328, 338 (1992).

The court found the evidence was relevant to defendant's state of mind and motive, satisfying Cofield's non-propensity purpose requirement. The court noted that the State established "defendant abused . . . [Kerilynn] throughout their relationship," and that defendant was "extremely jealous" of Hicks and was "also aware of . . . [Kerilynn]'s friendship with . . . Hall." The judge identified evidence that showed defendant was controlling of Kerilynn and jealous of her relationships with others. The judge found defendant had "physically assaulted . . . [Kerilynn] a number of times and also destroyed property, her cell phone, damaged her vehicle, and she and her family had received threatening phone calls[ and] letters. She outlined numerous different incidents[,] . . . however the State . . . limit[ed] what they[ were] seeking to admit."

The court stated, "Defendant argue[d] that he acted in self-defense when he killed the victim, and therefore, his defense puts his state of mind, i.e., his motive, directly at issue," citing State v. Nance, 148 N.J. 376, 388 (1997).

Specifically, the court held the evidence was relevant as to "defendant's peacefulness and aggression, and negate[d] self-defense, or possibly c[ould], [and] therefore, . . . f[ound] that the evidence . . . me[t] the first prong."

The court found the abusive relationship and history was also intrinsic evidence, reasoning:

> [P]ursuant to State v. Rose, [206 N.J. 141, 179 (2011)] it will be relevant as intrinsic evidence in explaining the full story or picture of what occurred here. This was a relationship, again, [in] which jealousy played a role. There was testimony of an abusive relationship. The one incident which occurred with the beating about the face, also the controlling nature, who she could talk to, who she couldn't, where she can go, the jealousy with . . . Hicks, the need for this so-called peace agreement [brokered by Hall], the [c]ourt finds is relevant.

The court also deemed Cofield's second prong of temporal proximity satisfied because they were close in time and continuous leading up to the encounter between defendant and Hall. The court addressed the third prong, finding Kerilynn's testimony was credible, and the State presented clear and convincing evidence of the "serious instances of abuse" and jealousy.

Finally, the motion judge found the heightened standard of the fourth Cofield requirement satisfied, stating:

> Under the fourth prong, the probative value of the prior bad acts must not be outweighed by its prejudice

A-0928-20

to . . . defendant.  Cofield, 127 N.J. at 338.  In cases involving motive, the courts are generally reluctant to exclude prior acts.  See [State v. Covell, 157 N.J. 554, 570-71 (1999);] [s]ee also State v. Castagna, 400 N.J. Super. 164[,] . . . 180 [(App. Div. 2008)].  At issue here is whether . . . defendant acted in self-defense or it was some sort of accident, or [he] allegedly committed a crime based on jealousy or intent. . . .

The instances that have been outlined directly underscore . . . the central issue in this case.  The so-called peace initiative which was cited also reflected on the fact that this is the central issue in this case.  The [c]ourt does not find that the prejudice from those prior instances that the State proffers outweighs the probative value.  What occurred here is up to the jury to determine[,] was it self-defense, was it an accident, was it knowing or purposeful, was [the jealousy] fueled by the abusive relationship . . . .

When you put all this together, it was symptomatic of what the relationship was.  He finds out Hicks is there, they go there, previously there's a major problem, there was this peace initiative all striving to, in essence, be a buffer, and the shot.  The State's theory is there was no provocation whatsoever.

. . . [D]efendant takes exception to that, and that's exactly the case that's going to be presented to the jury. Eliminating these other instances would not tell the story, would really not make sense in terms of what the issue really is before the [c]ourt.  Whether they conclude it was self-defense or an accident or that these other issues had no credibility, which really becomes a jury question, thus, the [c]ourt finds the fourth prong has been satisfied in all of these instances which are proffered to be admissible.

A-0928-20

The court thus identified and allowed testimony at trial limited to: (1) evidence of "physical violence allegedly perpetrated against [Kerilynn]" between July 10, 2007 and July 14, 2007, specifically an incident when defendant, suspecting Kerilynn had conspired with Hicks and Hall to ambush him, punched Kerilynn in the face while in the car, causing her to suffer injuries including a swollen face, (2) testimony of defendant's "controlling nature and . . . who she could talk to, [and] where she could go," (3) evidence of defendant's "jealousy of . . . Hicks," (4) Kerilynn's testimony that when she received a call from her mother on the day of the incident, defendant "made her put the speaker on" and after her mother "stated that the victim stopped by the house, . . . defendant . . . directed her to take [him] to the house," and (5) Kerilynn's testimony that she received a letter from defendant on February 19, 2009, threatening physical abuse "by stating if she testified at trial he would go after her and her family."

On remand, following oral arguments in June 2018 on defendant's renewed motion to bar the prior bad acts pursuant to Rule 404(b), the court issued a written decision deeming the prior court's ruling the law of the case. The court relied on the testimony from the prior Rule 404(b) hearing in 2009, finding that the State sought "to introduce the same evidence based on the

24

A-0928-20

identical arguments made," but indicated it would conduct a Rule 104 hearing prior to trial "to ensure [Kerilynn's] testimony comports with [the prior motion judge's] ruling."

The court subsequently addressed the substance of the testimony prior to opening statements on January 9, 2020. The prosecutor indicated the State did not "inten[d] to . . . dwell on the various and numerous episodes of physical abuse," suggesting, "in an effort to streamline and . . . make sure that [it] d[id not] go far afield," it would pose to Kerilynn specific leading questions, which it identified. Defense counsel objected, arguing that the prior judge's order was "over-broad." The court determined that the prior judge's decision was not "over-broad," finding that evidence of "defendant's physical abuse, controlling nature[,] and jealousy" was admissible as specified by the prior motion judge.

### 3. Motion to Exclude the Conversation Between Hall and Defendant

The court also adopted the prior motion judge's ruling, admitting testimony regarding the conversation between defendant and Hall prior to the shooting. At the Rule 404(b) hearing Kerilynn recounted that at "[t]he end of October, beginning of November," Hall told her, that, while defendant was parked in front of the Lowensteins' house, Hall went out and "told [defendant] that he[ was] tired of seeing [Kerilynn] upset because [defendant]" was not

25

A-0928-20

permitted at the house due to "problems between [defendant] and [Hicks], . . . that [Hicks] had a girlfriend, . . . and that [defendant] should just end the drama and make everything peaceful" to allow defendant to come to the house, and that defendant "shook [Hall's] hand." Kerilynn testified that defendant confirmed the conversation took place, but indicated it did not change anything.

The court found the conversation, occurring "a week or so" before the fatal encounter, was relevant to refute defendant's claim that Hall was the aggressor. It found Hall's statements to Kerilynn regarding the conversation with defendant were admissible and relevant to Hall's state of mind under Rule 803(c)(3), finding defendant put the victim's state of mind at issue by asserting self-defense.

B. The Trial

1. The Testimony and Evidence

Trial commenced on January 7, 2020. At trial, Kerilynn described her relationship with defendant, defendant's history with Hicks and Hall, and what occurred on the night of the shooting.

Kerilynn explained she started dating defendant in May 2006. At first, their dating was "[e]verything [she] could have wanted in a relationship" and

A-0928-20

defendant "always told [her] how beautiful [she] was and how wonderful [she] was. And all of the good things." However, she recounted that within a few months things changed, and defendant became controlling and abusive.

She described defendant's controlling behavior:

> He monitored who I spoke to. He told me who I could be friends with. If he was present and I got a phone call, the phone call had to be on speaker. I wasn't allowed to talk to any other males, or have male friends, and a lot of my female friends he didn't want me to be friends with anymore, as well.

Kerilynn explained that she took classes at Montclair State University, and sometimes he went with her and would wait in the car. If she did not meet him at her car within fifteen minutes of the end of her class, he would enter the school to look for her because "[h]e thought [she] was talking to somebody [who she] shouldn't be talking to on campus." She indicated that "[i]f a guy even spoke to [her], [defendant] would become angry and agitated." Sometimes he would yell at her and sometimes he would hit her, and "[t]here was a time where he used a leather strap on [her]."

According to Kerilynn, "there was no way [defendant] was going to allow [her] and any man to have a conversation." She stated defendant even got angry when she received a group text message from her college professor.

Explaining that Hicks, her ex-boyfriend, lived in the basement apartment

27

of her parents' house, Kerilynn recounted how Hicks remained close with her family, and her parents allowed him to live there after their breakup. She described defendant as not "comfortable" with Hicks living there; and, even though she told defendant that Hicks had a girlfriend, defendant "didn't want [her] to have any friendships with males." This included Hall, whom Kerilynn described as Hicks's best friend. According to Kerilynn, Hicks did not like defendant because he was aware that defendant was abusive towards her.

Kerilynn testified about the incident in July 2007, when defendant beat her suspecting she had "set him up" to be ambushed by Hicks and Hall. She told the jury she drove defendant home, dropped him off and watched him go inside. The next day, defendant drove Kerilynn to a "deserted" street in Newark and parked the car. Defendant told Kerilynn that he saw Hicks and Hall "sitting outside his house in a car waiting for him to come home," and accused her of trying to "set him up." She told him that was "absurd" because Hicks and Hall were out of town working at a carnival in Delaware. Kerilynn explained defendant wanted her to admit that she "had them waiting there, so that they c[ould] do something to him." Despite her denial, defendant "continued to tell [her] . . . he knew that . . . was them and that [she] had to tell the truth." He threatened that he was going to ask her if she "set him up" and "[e]very time

28

[she] lied . . . he was going to hit [her], but if [she] told the truth, he wouldn't touch [her]."

Defendant asked her again if she had set him up, "[a]nd when [she] said no, he punched [her]" in the face. Kerilynn said "[h]e hit [her] the same way he would hit a guy in a fight." Each time she denied his allegation, defendant hit her again. When asked how many times he hit her, she said,

> I can't recall exactly how many times he hit me, but I can recall that there came a point where my face was swollen that I could not take another hit, so I turned my face, so that he could hit the right side of my face, because I didn't think I was going to be able to take another hit on the left side.

She said she could "feel [her] face get swollen," and "[p]hysical pain that [she] never felt before," and she felt "dizzy" from the attack. She said her "mouth was bleeding," but the more she tried to assure him, the more he hit her. Eventually, she explained that it "got to a point where [she] needed him to stop hitting [her], so eventually [she] said yes, [she] did, so that he would stop." After Kerilynn capitulated and falsely admitted to his accusations, "he said that that's all he wanted was the truth, and that [they] could be together again and be happy." When she got home and her parents saw her face, they took her to the police station and the EMS provided treatment for her injuries. She stated defendant hit her on more than one occasion.

29

A-0928-20

After Kerilynn testified about defendant's past conduct, the court interjected and instructed the jury about the limited purpose of the testimony, as it did several times throughout the trial. The court cautioned:

> I would like you to listen closely. The State has introduced evidence that . . . defendant physically abused and controlled Kerilynn . . . and was jealous of her interacting with other men during the course of their relationship.
>
> Normally, such evidence is not permitted under our Rules of Evidence. Our rules specifically exclude evidence that a defendant has committed other crimes, wrongs, or acts when it is offered only to show that he has a disposition or a tendency to do wrong and, therefore, must be guilty of the charged offenses.
>
> Before you can give any weight to this evidence, you must be satisfied that . . . defendant committed the other act. If you are not satisfied, you may not consider it for any purpose. However, our rules do permit evidence of other crimes, wrongs, or acts when the evidence is used for a specific, narrow purpose.
>
> In this case, the evidence has been introduced to establish . . . defendant's motive for the killing, mainly, his jealousy of [Hall] and his desire to keep Kerilynn . . . from associating with other men.
>
> Whether this evidence does, in fact, establish defendant's motive for killing . . . Hall is for you to decide. You may decide that the evidence does not establish defendant's motive and is not helpful to you at all. In that case, you must disregard the evidence.
>
> On the other hand, you may decide that the

30

> evidence does establish defendant's motive and use [it] for that specific purpose.  However, you may not use this evidence to decide that . . . defendant has a tendency to commit crimes or that he is a bad person.
>
> That is, you may not decide that just because . . . defendant has committed other crimes, wrongs, or acts he must be guilty of the present crime. I've admitted the evidence only to help you decide the specific question of defendant's motive for killing . . . Hall.
>
> You may not consider it for any other purpose. You may not find . . . defendant guilty now simply because the State has offered evidence of other crimes, wrongs, or acts.

[(Emphasis added).]

Kerilynn also testified about the conversation between Hall and defendant in late October 2007.  She recalled that she drove defendant to her house and ran inside to get a movie while defendant waited in the car.  Hall was at her house and asked Kerilynn if defendant was there; she told Hall that defendant was waiting in the car.  He then told her that he was going to speak to defendant and left the house.  She said that Hall "was out there for just a few minutes and then he came back in [the house] with a smile" on his face.  She asked Hall what had happened, and Hall told her that they "shook hands and that he believed that [defendant] had a better understanding of the situation."  Kerilynn recounted the conversation as she had in her motion testimony—the gist being that Hicks and

31

Hall were not threats to defendant, and that defendant should make peace for Kerilynn's sake to allow him to visit freely at the Lowensteins' home.

According to Kerilynn, Hall also said that he told defendant that he and Hicks were leaving in two weeks—to attend the police academy and military basic training, respectively, "so why continue straining the relationship when very soon they wouldn't be in the house as much." Kerilynn also testified that she spoke with defendant, who confirmed that Hall approached and spoke to him. Defendant "was very . . . nonchalant about it," and "didn't seem excited that now he could come over and everything was going to be okay." She said defendant told her the conversation "d[id not] change anything."

Hicks also testified that he observed the conversation between Hall and defendant. Hicks confirmed the conversation as Hall reported it to Kerilynn. He added: "[T]he next thing you know, I believe they shook hands." According to Hicks, "they both agreed that [they] were going to drop it and then that was the end of it."

Regarding the night of the shooting, November 6, 2007, Kerilynn testified that she was with defendant who picked her up from work at 11:15 p.m. After they dropped off her co-worker, Kerilynn's mother called while she was driving home. Kerilynn placed the phone on speaker so defendant could hear her

32

A-0928-20

conversation. She testified her mother asked her not to bring defendant over that night because she was not feeling well and because Hicks, his girlfriend, and Hall were over, "[a]nd she just didn't want to have to worry about people and them having an altercation. She wanted to be able to go to bed and rest, so it would be better if he didn't come." Kerilynn explained defendant "wasn't happy" that Maryann did not want him to come over because Hicks and Hall were at the house. Defendant told Kerilynn that "he was coming." Maryann testified confirming the conversation.

Hall's girlfriend, Laura Mattia, testified she drove Hall to the Lowensteins' house that night. She explained that earlier that day she picked up Hall, who had been her boyfriend for over three years. She dropped him off at Verona Park and went to her evening class at Essex County College. Mattia explained Hall was running in the park as he was set to attend the police academy in a couple of weeks to become a Newark police officer like his father. After her class was over, Mattia picked up Hall and they went to eat, but because she hit traffic on the way back to Newark, she suggested that she drop him off to stay with Hicks. According to Mattia, Hall agreed, as he was excited to see Hicks before Hicks left for Army basic training. Mattia dropped off Hall at the Lowensteins' house.

33

A-0928-20

Mattia described Hall's demeanor as consistent with his "normal, sunny personality." She described him as someone who never drank liquor, "wanted to get guns off the streets," and was working at a home for disabled adults until he went to the police academy. She said he was dressed in a "sweatshirt and black swishy pants, like windbreaker pants," that she described as "very light pants."

Kerilynn testified that when she and defendant got to her house, the two went to the kitchen where they were "laughing, talking, hugging, [and] kissing." She explained that while close to him, her hands did not "go anywhere near [defendant's] pants pockets" or "near the pockets of his hoodie"; she kept her hands "around his . . . waist and upper torso." At one point, Hicks came up from the basement into the kitchen wearing a pair of defendant's jeans that Maryann had mistakenly put with Hicks's laundry. Although Kerilynn offered to return the jeans, defendant was upset and argued with her all week, telling her that he did not want the jeans back because Hicks had worn them. She explained that defendant saw Hicks wearing his jeans that night and "kind of laughed and was like oh, there's my jeans."

Melissa Schmidt, Hicks's girlfriend at the time, testified that on the evening of November 6, 2007, she was in the basement with Hicks. When Hall

34

A-0928-20

arrived at the Lowenstein house, he knocked on the basement window and Hicks went upstairs to let him in the house. Schmidt, Hicks, and Hall watched television in the basement and Maryann came down and spoke with them for a brief visit; after she left, Hicks went upstairs to get a drink for Schmidt. When he returned, they continued watching television. She testified Hall then went upstairs to microwave leftover food he had brought with him.

Kerilynn recounted sitting at the kitchen table with defendant when Hall came up from the basement. She recalled Hall grabbed something from the refrigerator and then asked her why she had not told him that she had started working at Victoria's Secret. Kerilynn did not "want to have a conversation with him, because [she] didn't want [defendant] to get upset, so [she] responded with a sarcastic remark," but Hall repeated the question.

Kerilynn explained that after Hall asked her the second time, defendant "kind of slammed his hands on the table and said stop talking to my girlfriend." Hall responded, "I'm just asking her a question." Defendant then dared Hall, "ask again." Kerilynn "knew that there was going to be an argument, so [she] got up and walked out of the kitchen to go get [her] parents, . . . [because] if they started fighting, [she] couldn't break it up." She recalled that when she left the kitchen, Hall was standing at the refrigerator while defendant was still seated

35

in a chair. She walked quickly to the stairs, because she "wanted to get [her] parents before [defendant and Hall] started fighting." She heard defendant and Hall "exchanging words" as she walked away.

She then heard Hall start screaming "whoa, whoa, whoa" and as she reached the bottom of the stairs, she "heard a very loud sound that sounded like a gunshot." She "froze[] and ran back into the kitchen." From the dining room, on the way back to the kitchen, she "saw [Hall] on the ground and [defendant] standing on top of him." She explained Hall's "knees were curled up and he was using his arms" "to try to grab a hold of the gun," that she saw defendant holding in his right hand, "pointed directly at [Hall]." She described defendant as "sort of bracing himself on [Hall]'s knees and leaning directly over him with his arms extended straight in front of him pointing the gun at [Hall]."

Kerilynn testified that she "couldn't stand there and watch it. [She] had to try to stop it." She screamed defendant's name to try and get his attention, attempting to grab the gun from defendant, but "[h]e wouldn't give it to [her]." She was "pulling [defendant's] forearm towards [herself], so that the gun was actually pointed at the floor and not at [Hall]'s head." She said Hall was on the floor, screaming as she continued to struggle with defendant over the gun, and "[b]ecause of the way [she] was standing, . . . the gun was then pointed at [her]

36

A-0928-20

leg." She let go of defendant, put her hands up, and said, "Fipo, what are you doing?" After she released defendant's arms, defendant "pointed the gun back at [Hall] and shot him." Kerilynn noticed that Hall was shot in "the back side part of his head," as Hall was "moving to try to get away from the gun."

She testified that she did not actually see defendant flee the scene because her focus was on Hall who was moaning, and she noticed "blood coming out of his head." Kerilynn testified that Hicks ran upstairs from the basement and into the kitchen; he "jumped onto the ground[,] . . . grabbed [Hall], and . . . the phone that was right on top of the counter, . . . and . . . called 9-1-1."

Kerilynn's parents came downstairs and her father asked her what happened, and she told them Hall was in the kitchen because "Fipo had shot him." Kerilynn's mother grabbed her and asked, "[W]hat happened[?]" Kerilynn replied, "Fipo shot [Hall]." Kerilynn described herself as "sort of calm, like in shock," she grabbed her purse to leave and, when asked where she was going, said she "had to go find Fipo." Her father stopped her, and Kerilynn "immediately broke down."

Police responded, finding Hall alive but bleeding profusely, and interviewed those present, as Hall was transported to the hospital. At first, Kerilynn told police that she did not witness either gunshot. When she was

37

A-0928-20

informed that Hall was going to be "okay," she then admitted she had seen the second shot. At trial, Kerilynn explained that she was initially untruthful because she feared defendant. Kerilynn stated she did not see or feel a gun on defendant, noting that prior to Hall walking into the kitchen, she and defendant were laughing, and she was kissing and hugging him. Hicks testified at trial that he never saw Hall with a gun when Hall left the basement and did not know Hall to ever own a gun or "speak about a gun."

Detectives Delaney and Brazofsky testified consistent with their motion testimony. Detective Delaney described the detectives eventually locating defendant in the Thompson apartment, sitting on the living room couch with the gun in the duffel bag feet away. The State did not present testimony that defendant nodded toward the gun in the duffel bag; instead Detective Brazofsky testified that he was "advised that there was a firearm that was observed in a duffel bag inside the living room," and observed a black duffel bag with "an open top [and] side pockets," and saw in it a "white plastic bag and through the plastic[,] . . . a handle of what appeared to be a firearm."

Detective Delaney testified that, after retrieving the gun, he "started to get ready to bring . . . [defendant] from the residence . . . to Lyndhurst Police Headquarters," and approached defendant and asked "if anything else in the bag

38

was his." The detective stated defendant responded, "nothing but the gun and that's it," adding the cell phone also belonged to him. BCPO Detective James Joseph Bordino, III, testified that he also collected a "men's jacket, size 3XL" that James advised belonged to defendant.

Detective Delaney testified that while transporting defendant for questioning, he advised defendant they "were bringing him to Lyndhurst Police Headquarters, and that [they] were going to bring him there to interview him in reference to a shooting that had occurred." The detective told the jury that defendant replied, "[H]e didn't know what [he] was talking about, or anything about it," and there was no further conversation on the ride to police headquarters.

Detective Delaney explained that upon arrival, defendant was brought to a holding area and eventually provided a recorded formal statement. The State played defendant's recorded statement for the jury.

The State's expert in neurosurgery—a neurosurgeon at Hackensack University Medical Center—testified that he responded to a call to the operating room at 1:30 a.m. on the day of the incident to evaluate Hall. He found Hall "semiconscious on arrival, . . . rapidly declined in consciousness, and . . . became comatose, as evidenced by the fact that his neurological

39

examination demonstrated signs that his brainstem wasn't working."

Dr. Mary Ann Clayton of the Bergen County Medical Examiner's Office testified on behalf of the State as an expert in forensic pathology. She testified that two days after his admission, Hall was "declared brain dead," and deceased. She performed an autopsy. Dr. Clayton testified that upon examining Hall, she observed he had a "black eye" on his right upper eyelid that was "caused by an internal injury from the bullet." Hall had suffered two gunshot wounds—one to his stomach, which fractured his pelvic bone, and one to the back right side of his head. Although Hall could have survived the gunshot to the stomach, the gunshot to the head was fatal.

Dr. Clayton determined, "based on the way . . . the bullet [went] through the muscle wall and the path that it took, it w[as] . . . very likely that . . . Hall was bent over slightly at the waist" and his left side was facing the shooter. As for the wound to the right back side of Hall's head, Dr. Clayton testified that Hall was positioned "consistent with the right side of his head being visible or presenting to the gun[,] . . . the left side of his head being down."

Detective Delaney testified regarding defendant's threats and attempts to influence witness testimony. He explained that, days after his arrest, defendant wrote his sister a letter telling her to "pull [Kerilynn] to the side and explain to

40

her that she needs to discharge the statement she put on [him] the night all of this happened . . . if she . . . wants to see [him] again." Defendant also wrote that Kerilynn "needs to lie to the [j]udge when he calls her up to testify against [him] . . . [and] she's not going to get in any type of trouble. . . . But this is going to look good on [his] behalf." Defendant wrote another letter to his sister again asking her to convince Kerilynn to "discharge" her statement. He asked her to convince Hicks to "discharge" his statement as well and to let him know that they "could handle this situation out in the streets. Not through the [c]ourts nor no [j]udges, nor him dropping statements." The letters were entered into evidence.

Kerilynn testified that, two years later, prior to the first trial, defendant sent her a handwritten letter, threatening, "[I]f you make this s[***] harder for me by continuing your lying, I'll go after you and your entire family when I get home." Subsequently, a no-contact order was entered; but defendant called Kerilynn several times to pressure her to change her statement against him.

2. Opening and Closing Statements

The State argued in both opening and closing statements that defendant shot an unarmed Hall out of jealousy over Kerilynn. In her opening statement, the prosecutor alerted the jury that it would hear that defendant's controlling and

sometimes "violent" relationship with Kerilynn motivated defendant, who had armed himself with a gun, to murder Hall.

Defense counsel argued Hall "produced the gun as Keri[lynn] turned around to either intimidate [defendant] or to shoot him," causing defendant and Hall to fight and Hall "ended up getting shot the first time, which was not fatal"; but, after Kerilynn attempted to retrieve the gun, there was "a three-way tug-of-war," and a second shot was fired hitting Hall in his head.

Defense counsel argued in summation that the evidence demonstrated defendant "did not have a gun on him," explaining that Kerilynn had testified she never saw defendant with a gun, nor did she feel a gun on defendant despite having been in close proximity, "hugging and kissing him[,] . . . surrounding him[,] and holding him at his waist." The defense claimed Hicks came upstairs from the basement and saw defendant and Kerilynn together, and returned downstairs to inform Hall defendant was there. Counsel claimed Hall came from downstairs "carrying some food in a bag" that "was never found," suggesting that the bag "maybe" contained the gun.

Defense counsel attempted to explain defendant's formal statement at police headquarters regarding the gun. Counsel contended defendant "admitted . . . the gun was his, meaning that the gun was in his possession at the

42

time that he was in Orange," arguing it was "constructive possession," as the gun was not found on defendant's person. Counsel then stated that defendant's admission should

> not . . . be construed to mean that he purchased the gun and that he had a purpose in purchasing the gun and that that purpose was to go after . . . Hall at midnight in the kitchen of a house in Lyndhurst when he had no expectation that . . . Hall would even be there. We cannot take it that far. But this is where the State wants you to take that statement. Again, you'll remember from the statement that as soon as he got started talking about a gun the interview stopped.

Defense counsel also reviewed Kerilynn's testimony of defendant's controlling and abusive conduct, suggesting the State "tr[ied] to create this narrative that [defendant], the [seventeen-]year[-]old, was . . . a monster, beating up on his girlfriend, being controlling, not allowing her to talk to guys." Counsel argued defendant's abuse ended in September 2007, two months before the shooting, and suggested that Kerilynn controlled defendant by providing him money, access to her car, and a cell phone.

The prosecutor countered in summation that there was no evidence or testimony that Hall brought the gun that night. Rather, the State argued that Kerilynn testified "she did not put her hands in the pockets of [defendant's] jacket" or "in the pockets of his pants," and the jury could "reasonably infer a

43

gun could be hidden and secreted." The State highlighted the size 3XL jacket defendant had been wearing, which could have easily concealed the weapon.

The prosecutor posited that defendant and Hall began to argue, causing Kerilynn to leave the kitchen to get her parents, when she heard Hall scream prior to the first gunshot "because he saw the gun," and attempted to "get away." The prosecutor insisted that "people who possess guns don't scream for help as . . . Hall did," commenting:

> [I]f it were really true, that would be something [defendant] would have said early and often, and he didn't, and that omission is damning. And the reason why he didn't say it is because it's not what happened. And that evidence is most clearly displayed in the letters he wrote to his sister one week after the murder, three days after he was charged with murder. That is damning. That omission speaks volumes because he knew . . . what he did. . . .

The State also theorized that when defendant "fired th[e] second shot to the back of [Hall's] head[,] [defendant] was standing behind [Hall] as he desperately tried to crawl away." It argued Kerilynn physically attempted to prevent defendant from using the gun, but when she saw the gun was pointed at her leg, she let go of defendant and observed him point the gun back at Hall whose back was facing him while on the ground, holding the gun with his right hand, aiming for the back of Hall's head, and firing a second gunshot.

A-0928-20

The prosecutor referenced defendant's statement to police offering "nothing but the gun" in the duffel bag belonged to him and defendant's formal statement, admitting again that the gun was his. The prosecutor referenced defendant, when asked, "Why do you think you're here today," replied, "I really don't know. That's what I want to know. Why am I here?" The prosecutor asserted if Hall had a gun, defendant had the opportunity to explain that, but instead, he lied, demonstrating "consciousness of guilt."

The prosecutor addressed Kerilynn's testimony in summation regarding her abusive history with defendant, stating in totality:

> The jealousy here . . . can [be] see[n] from the evidence. [Hall] and [Hicks] represented the absolute obstacle to [defendant]'s complete control over Keri[lynn]. And that is vividly displayed in the evidence about the incident that occurred in July of 2007. Keri[lynn] told you about it you'll recall. And what Keri[lynn] said was [defendant] said to her I know those two guys tried to set me up, I saw them. And what's interesting—there's a couple of interesting things about that.

> The first interesting thing is he could have had this conversation with her anywhere in the mall, in the car, at a park, on Halleck Street, but he chose to drive her to a deserted street in Newark. And he told her now you are going to agree with me that this is what happened, and if you don't I will punch you in the face. And as Keri[lynn] told you, that wouldn't be the first time he punched her. And Keri[lynn] stood up for [Hall] and [Hicks] and she said I'm not going to lie

45

> when I know that they're at a carnival out of state. . . . She said I'm not going to do that, I'm not going to do that, I'm not going to lie about [Hall] and [Hicks], they didn't do it. And proceeded to punch her, and she still wouldn't do it. And he punched her again, and she still wouldn't do it. And he kept punching her, she said, until the right side of her face got so swollen she simply turned her head and presented the left side to him. But ultimately, because of the pain that was inflicted she gave him what he wanted, and then he stopped.

The court then gave final instructions to the jury, repeating the same cautionary instruction on its use of evidence pertaining to defendant's past abuse of Kerilynn and his jealousy of her relationships with other men.

## II.

We address defendant's arguments on appeal in the order raised in his brief.

### A. Prior Bad Acts Evidence

Defendant first challenges the admission of other crimes evidence, asserting, "[t]he prosecution was wrongly permitted to introduce extensive, irrelevant, and immeasurably prejudicial other-crimes testimony from [his] former girlfriend Keri[lynn] that he frequently beat her up, including punching her in the face causing swelling and black eyes, among other injuries." He emphasizes that he "was charged with shooting . . . Hall, a friend (not a suitor) of Keri[lynn], defendant's girlfriend. There is a lack of any connection between

A-0928-20

the prior bad acts against Keri[lynn] and the spontaneous shooting of [Hall]."
He alternatively argues that the evidence, if permitted, should have been
sanitized of its prejudicial detail.

We review a trial court's evidentiary rulings under the abuse of discretion
standard. See State v. Medina, 242 N.J. 397, 411-12 (2020); State v. Prall, 231
N.J. 567, 580 (2018). We will not "substitute [our] own judgment for that of the
trial court" unless there was a "'clear error of judgment.'" State v. Perry, 225
N.J. 222, 233 (2016) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). The
trial court's ruling must be "so wide of the mark that a manifest denial of justice
resulted." Ibid. (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

We have thoroughly reviewed the motion and trial record and conclude
the evidence was properly admitted as intrinsic evidence, or alternatively under
Rule 404(b).

Fundamentally, to be admissible at trial, evidence "must be relevant—that
is, it must have 'a tendency in reason to prove or disprove any fact of
consequence to the determination of the action.'" State v. Sanchez-Medina, 231
N.J. 452, 462 (2018) (quoting N.J.R.E. 401). The court's "inquiry focuses on
'the logical connection between the proffered evidence and a fact in issue,'" and
"[e]vidence need not be dispositive or even strongly probative in order to clear

the relevancy bar." State v. Buckley, 216 N.J. 249, 261 (2013) (quoting Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 15 (2004)).  The court should ask "whether the thing sought to be established is more logical with the evidence than without it." Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 302 (App. Div. 1983)).

"Even if relevant, 'evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues, or misleading the jury.'" Sanchez-Medina, 231 N.J. at 462 (omission in original) (quoting N.J.R.E. 403).  Probative value "is the tendency of the evidence to establish the proposition that it is offered to prove." State v. Wilson, 135 N.J. 4, 13 (1994).  To be admissible, evidence "must be 'relevant to a material issue,' and its probative value 'must not be outweighed by its apparent prejudice.'" Sanchez-Medina, 231 N.J. at 465 (quoting Cofield, 127 N.J. at 338).

When considering the admissibility of evidence of a defendant's unsavory past conduct, courts view the analysis through a presumption of exclusion. Specifically, Rule 404(b) provides:

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.

However, Rule 404(b) does not exclude evidence of other crimes, wrongs, or acts under all circumstances. See Nance, 148 N.J. at 386. "Such evidence is inadmissible only if offered to prove a disposition to commit crime or wrong or a specific type of act as a basis for an inference that an individual committed a crime or wrong or act at some relevant time." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 7 on N.J.R.E. 404 (2023-24). "N.J.R.E. 404(b) explicitly makes such evidence admissible to prove some other fact in issue." Ibid.

In Cofield, the Supreme Court established a four-prong test to determine the admissibility of other-crimes evidence under Rule 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [127 N.J. at 338.]

A trial court must make a threshold determination as to whether bad acts evidence is subject to a Rule 404(b) analysis or is so intrinsic to the charged

49

offense as to fall outside heightened 404(b) scrutiny.  Rose, 206 N.J. at 177 ("[E]vidence that is intrinsic to the charged crime is exempt from the strictures of Rule 404(b) even if it constitutes evidence of uncharged misconduct that would normally fall under Rule 404(b) because it is not 'evidence of other crimes, wrongs, or acts.'" (emphasis omitted)).  Evidence is intrinsic if it "directly proves" the crime charged or if the other wrongs or bad acts in question were performed contemporaneously with, and facilitate, the commission of the charged crime.  Id. at 180 (quoting United States v. Green, 617 F.3d 233, 248-49 (3d Cir. 2010)).  This may include evidence "'to provide necessary background information' about the relationships among the players as a proper purpose."  Id. at 181 (quoting Green, 617 F.3d at 249).

When evidence is intrinsic, it is subject to the probative value/prejudice balancing test under Rule 403, not prong four of Rule 404(b).  Id. at 177-78, 181.  The Rose Court explained:

> There is no need to regard . . . Rule 404(b) as containing an exhaustive list of non-propensity purposes permitted of other crime evidence. . . . [T]here is no reason that our courts cannot allow, under . . . 404(b), evidence to be admitted for . . . "necessary background" or, as otherwise stated, "the need to avoid confusing the jury," non-propensity purpose.
>
> [Ibid. (quoting Green, 617 F.3d at 249).]

Here, we discern no error in the court's admitting the evidence of defendant's jealous, controlling, abusive relationship with Kerilynn as intrinsic evidence of "the full story or picture of what occurred here," and to establish the connection between defendant, Kerilynn, Hicks, and Hall at that moment in time. Alternatively, we conclude the evidence was properly admitted under the Cofield test for the non-propensity purposes of establishing defendant's state of mind and motive.

The evidence of defendant's relationship with Kerilynn, marked by a continuous cycle of controlling, jealous behavior and domestic violence, was inextricably integral to understanding the interrelationship between the parties and their respective conduct the night of the shooting. Defendant's possessive need to control Kerilynn, and his jealousy of Hicks, and by association Hall, catalyzed defendant's explosive reaction to Hall's otherwise benign questions to Kerilynn regarding her new job. The ongoing disputes between these individuals related to defendant's past abuse of Kerilynn, and defendant's specific anger over Kerilynn's relationship with Hicks and Hall, were intrinsic to the fateful encounter.

Their relationship explained Kerilynn's conduct in running for help as defendant's jealousy flared and her initially denying to police that she saw

51

defendant aim and shoot Hall in the head. The intensity and abusive dynamic of the relationship that precipitated the deadly shooting placed Kerilynn's behavior, and that of others, including defendant, in context.

Even assuming the evidence did not fit neatly within the definition of "intrinsic" proof, we conclude it was also properly admitted as evidence of defendant's state of mind and motive under Rule 404(b). Defendant asserted self-defense, placing his own state of mind squarely at issue. See Nance, 148 N.J. at 388 (holding the defendant put "'his own state of mind in issue,'" when "he claimed that it was accidental and in self-defense," and therefore his "state of mind was a relevant issue, and the motive of jealousy was a proper basis upon which the jury could conclude that [the] defendant did or did not intend to shoot [the victim]." (emphasis omitted) (quoting State v. Oliver, 133 N.J. 141, 155 (1993))).

Likewise, defendant's motivation for such fatal unprovoked violence was at issue, as he attempted to cast Hall as the initial aggressor. In general, "[a] wide range of motive evidence is generally permitted, and even where prejudicial, its admission has been allowed in recognition that it may have 'extremely high probative value.'" Rose, 206 N.J. at 165 (quoting State v. Long, 173 N.J. 138, 164-65 (2002)). The State may prove a defendant's motive by

multiple proffers of evidence. See ibid. That defendant beat Kerilynn at the mere suggestion of her association with Hicks and Hall was not offered to show: if he abused Kerilynn, he must have shot Hall. It was offered as highly probative non-propensity proof of defendant's state of mind and motivation related to the shooting.

We reject defendant's claim that because he harbored intense jealousy of Hicks, there was no basis to conclude he also held animus toward Hall. The record demonstrated defendant knew the closeness of Hall's relationship with Hicks and Kerilynn, and he was aware Hall knew of defendant's abuse of Kerilynn. Further, the incident in which Kerilynn was physically beaten by defendant was in direct response to defendant's claim that she "set him up" with Hicks and Hall, who defendant claimed were sitting outside his residence intending harm. This evidence showed great effort was made to separate these individuals to avoid conflict. As evidenced by the testimony recounting Hall's approaching defendant attempting to "make peace" for Kerilynn's sake, Hall was squarely implicated in the ongoing animosity between defendant and Hicks. This evidence was woven into the narrative of events and interrelationship of the parties, and its admission was not error.

Likewise, the evidence regarding defendant's threats and attempts to influence Kerilynn to "lie" and "discharge her statement," were properly admitted as relevant to defendant's consciousness of guilt and to directly refute his claim of self-defense. "Evidence of conduct of an accused subsequent to the offense charged is admissible only if probative of guilt." State v. Mann, 132 N.J. 410, 418 (1993) (citing State v. Rechtschaffer, 70 N.J. 395, 413 (1976)). In assessing relevance and probative value, "conduct that occurs after the charged offense circumstantially may support inferences about a defendant's state of mind." State v. Williams, 190 N.J. 114, 125 (2007). Our courts "specifically have recognized the relevance of post-crime conduct to a defendant's mental state when the conduct demonstrates consciousness of guilt." Ibid. Tampering with or destroying evidence is "classic consciousness of guilt evidence." Id. at 129, 132-33 (recognizing that "consciousness of guilt evidence's probative value on state of mind is weighty . . . notwithstanding that the evidence carries with it a prejudicial effect"). Defendant's post-crime attempts to influence witnesses related directly to defendant's state of mind and were properly admitted.

Defendant does not challenge that the second and third prongs of the Cofield test were satisfied; nor do we discern an abuse of discretion in the motion judge's finding that the events were close in time, and Kerilynn's

testimony amounted to clear and convincing evidence of defendant's conduct and jealousy. Defendant argues, however, even if we were to find the evidence intrinsic or relevant for a non-propensity purpose, it should have been excluded as too prejudicial under either Rules 403(b) or 404(b). He argues, alternatively, that the court should have restricted and sanitized the evidence rather than permit the detail that was presented at trial.

We are mindful that "evidence of a defendant's previous misconduct 'has a unique tendency' to prejudice a jury, [and] it must be admitted with caution." State v. Willis, 225 N.J. 85, 97 (2016) (quoting State v. Reddish, 181 N.J. 553, 608 (2004)); see also State v. Stevens, 115 N.J. 289, 302 (1989). The "inflammatory characteristic of other-crime evidence . . . mandates a careful and pragmatic evaluation by trial courts, based on the specific context in which the evidence is offered to determine whether the probative worth of the evidence outweighs its potential for undue prejudice." Stevens, 115 N.J. at 303. However, as the Court has emphasized when assessing admissibility of prior bad acts evidence:

> [A]ll highly probative evidence is prejudicial[] because it tends to prove a material issue in dispute. The determinative question is whether the evidence was unfairly prejudicial, that is whether it created a significant likelihood that the jury would convict defendant on the basis of the uncharged misconduct

> because he was a bad person, and not on the basis of the actual evidence adduced against him.
>
> [Rose, 206 N.J. at 164.]

Against this backdrop, we conclude that even employing the heightened standard of Rule 404(b), the probative value of the evidence was not outweighed by its prejudice. See Cofield, 127 N.J. at 338. As to Kerilynn's general testimony regarding defendant's controlling behavior, a review of the expansive evidence in the motion record reflects that the trial testimony was significantly streamlined and generalized from the very specific and detailed testimony provided at the motion hearing. Having already determined its strong probative nexus to the material issues in the case, we do not view its prejudice as outweighing its important probative purposes.

Regarding specific instances of conduct, the testimony about defendant's beating Kerilynn in direct response to defendant's claim that Hall and Hicks staked out his home for a potential confrontation was certainly descriptive. However, we view the intensity of defendant's attack on Kerilynn as directly tethered to defendant's reaction to his misperception of the "alliance" between Kerilynn, Hicks, and Hall, and highly probative of the degree of anger Hicks and Hall engendered in defendant related to Kerilynn. We are not persuaded that the testimony, already somewhat sanitized and limited relative to the vast

A-0928-20

record of abuse presented at the motion hearing, was so graphic as to unfairly distract the jury from the purpose of this evidence, particularly given the court's thorough limiting instruction which emphasized the purpose of the evidence.

The court repeated the cautionary limiting instruction to the jury. It carefully advised the jury it was prohibited from considering this evidence for any other purpose than to determine defendant's motivation for shooting Hall. The jurors were reminded several times they were prohibited from using this evidence to show defendant committed past violent acts, so he must have killed Hall. Consequently, we discern no error in the court's decision to admit the evidence, or in the nature of the testimony or the limiting instruction. The court did not err in finding that, without this vital information, the jury would have been blindfolded to the complete picture of the events leading to the fatal shooting.

B. Conversation Between Hall and Defendant

Defendant next raises the related argument that the court erroneously admitted Kerilynn's and Hicks's accounts of the conversation between Hall and defendant that occurred approximately one week before the shooting in which Hall called for peace. Defendant argues this testimony was inadmissible "double hearsay" that met no exception. Hicks testified that he heard first-hand the

A-0928-20

conversation between Hall and defendant. Kerilynn related Hall's statements to her about his exchange with defendant. We have reviewed the record and are satisfied the testimony regarding Hall's out-of-court statements were properly admitted under Rule 803(c)(3), as the statements went directly to both Hall's and defendant's respective states of mind, which were both in issue.

Rule 803(c)(3) provides:

> A statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

"When a matter places a declarant's state of mind in issue, the Rule allows a declarant's out-of-court statement to be admitted for that singular purpose." State v. Scharf, 225 N.J. 547, 569 (2016) (citing State v. Benedetto, 120 N.J. 250, 255-56 (1990)). "The exception is applied carefully; hearsay testimony is admissible on state of mind when it is relevant and bears a logical connection to the issues at trial." Ibid. (citing State v. McLaughlin, 205 N.J. 185, 189 (2011)). For example, it has been found that "[a] victim's state-of-mind hearsay statements are relevant to assessments of his or her own actions, and thus such statements can be relevant in the assessment of the truth of another's stated

reasons for conduct that occurred with that victim." Id. at 570 (citing State v. Calleia, 206 N.J. 274, 296 (2011)).

Hicks overheard the conversation directly. Therefore, his testimony was not double hearsay, and was properly admitted. He testified that Hall made an overture to defendant to stop the feud. This clearly suggested Hall's state of mind, and any testimony regarding defendant's response was a party admission under Rule 803(b) (statements of party opponent circumvent hearsay bar).

Kerilynn's testimony about Hall's statements to her were not inadmissible because (1) when made to defendant, they reflected Hall's state of mind to relax tensions and (2) when relayed by Hall to Kerilynn, they demonstrated Hall's state of mind believing he had brokered peace. Accordingly, the testimony cleared the double hurdle for admission. We further note that even if Kerilynn's testimony was viewed as once removed from admissibility, it was cumulative of testimony properly admitted through Hicks and through defendant's own party admission to Kerilynn that the conversation took place, the two shook hands, but, in defendant's view, changed nothing.

C. Defendant's Statements to Police

We next address defendant's argument that reversal is required based on the trial court's erroneous admission of all his statements to police, including:

A-0928-20

(1) his head nod toward the duffel bag containing the gun; (2) his response when asked if anything else in the bag belonged to him, stating, "nothing but the gun"; (3) his statement, "I don't know anything about that," after Detective Delaney advised him police wanted to speak to him regarding a shooting; and (4) his formal statement at police headquarters. Because the trial judge relied on the first motion record as well as the supplemental record on remand, we have carefully considered both records in light of defendant's arguments and the testimony at trial, and identify no error, alone or in the aggregate, warranting reversal of defendant's conviction.

When reviewing a trial court's decision whether to admit into evidence a defendant's statements to police, we "defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." State v. Sims, 250 N.J. 189, 210 (2022). Deference to a trial court's factual findings is appropriate given the trial court's "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. S.S., 229 N.J. 360, 374 (2017) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). The trial court's legal conclusions, however, are reviewed de novo. See State v. Hubbard, 222 N.J. 249, 263 (2015).

60

"The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." State v. Nyhammer, 197 N.J. 383, 399 (2009). Both N.J.S.A. 2A:84A-19 and N.J.R.E. 503 mirror the Fifth Amendment rule, stating that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate." State v. O.D.A.-C., 250 N.J. 408, 420 (2022).

"To counteract the pressures inherent in custodial interrogation, the Court mandated a set of warnings that law enforcement officers must give a suspect before beginning an interrogation . . . ." State v. Tiwana, 256 N.J. 33, 41 (2023). These include advising of the right to remain silent and the right to counsel, and the failure to inform a defendant of his Miranda rights prior to a custodial interrogation "creates a presumption of compulsion," and any spontaneous statements must be suppressed, even when they "are otherwise voluntary within the meaning of the Fifth Amendment." Oregon v. Elstad, 470 U.S. 298, 307 (1985); see also State v. O'Neill, 193 N.J. 148, 170 (2007).

A-0928-20

## 1. Pre-Miranda Statements

Defendant claims that the court improperly permitted testimony about defendant's nodding in the direction of the duffel bag and gun in response to Detective Rodriguez's singular question, "[Are] there any weapons in this house[?]" when defendant was first handcuffed but prior to any Miranda warnings. The first motion judge and the second trial judge considered the totality of the circumstances and determined that the non-verbal gesture was admissible under the narrow public safety exception to Miranda requirements. Both courts heard the testimony of the police officers and determined the need to protect the safety of the officers and others warranted a single question regarding whether the firearm was in the house. We decide the issue recognizing that no reference was ever made at trial to defendant's non-verbal gesture.

The public safety exception to the requirement that a person subjected to custodial interrogation by police first be given Miranda warnings allows police to question an accused, prior to advising of those rights, when there is a public safety concern. See Quarles, 467 U.S. at 657. In Quarles, the police were investigating a sexual assault committed with a handgun. Id. at 652. The suspect was apprehended carrying an empty gun holster inside a grocery store. Ibid. Immediately after handcuffing the suspect, and prior to administering

Miranda rights, a police officer asked about the location of the gun.  Ibid.  The suspect "nodded in the direction of some empty cartons and responded, 'the gun is over there.'"  Ibid.

The Quarles Court emphasized that "in the very act of apprehending a suspect, [the police] were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket."  Id. at 657.  The Court thus reasoned that "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunciated in Miranda."  Id. at 653.  The Court characterized the exception as "narrow," and "in each case . . . circumscribed by the exigency which justifies it."  Id. at 658.

The New Jersey Supreme Court adopted the public safety exception in State v. O'Neal, 190 NJ. 601, 624 (2007) holding that the questioning of a suspect prior to the administration of Miranda warnings was acceptable when the situation presented an "objectively reasonable need to protect the police or the public from any immediate danger associated" with a weapon.  190 N.J. at 618 (quoting Quarles, 467 U.S. at 659 n.8).

This court has held,

A-0928-20

[i]n order to establish the need to invoke the exception, the State must generally demonstrate "(1) there was an objectively reasonable need to protect the police or the public; (2) from an immediate danger; (3) associated with a weapon; and that (4) the questions asked were related to that danger and reasonably necessary to secure public safety."

[State v. Stephenson, 350 N.J. Super. 517, 525 (App. Div. 2002) (quoting State v. Prim, 730 N.E.2d 455, 463 (1999)).]

The exception is not restricted to public places and may apply in private settings.

Id. at 527-28.

In the totality of any particular set of circumstances, a missing gun in a private location, such as a home, apartment or motel room might pose the requisite danger to the police or public to justify the exception. However, to the extent that public safety is implicated, the gun must be reasonably believed to be in an unknown location (even if private) which is accessible to third parties and not reasonably capable of being secured. It is the overall circumstances, not merely the location, therefore, that controls.

[Ibid.]

Importantly, "sanction[ing] unwarned questioning about the presence or whereabouts of a gun in every case where a gun is suspected would result in the exception swallowing the rule." Id. at 525.

The trial court, like the prior motion judge, analyzed the circumstances police encountered upon locating defendant and found they warranted

application of the public safety exception. Both found the testifying officers credible. Each determined that those officers were sent to locate and apprehend defendant, not to investigate the shooting they knew little about or to search for evidence of that crime. The trial court found that although the NFT officers located and secured defendant and swept the apartment determining no other individuals beyond defendant's sister, James, and his mother were present in the home, the question was reasonable to protect the safety of the officers and others. The trial court found the "firearm could have been hidden within the cushions where . . . defendant was sitting, within his reach, his movement hampered, but not completely impeded by handcuffs," and the others present, although in the kitchen, were not in custody. Thus, the court determined "locating any weapon was a paramount concern to protect the officers' and others' safety," and the question was limited to inquiring whether there was a gun in that house.

We recognize the officers' safety was "a paramount concern," and the officers had little detail regarding the shooting or defendant's relationship to that apartment or the people in it. Defendant's sister had informed police defendant called upset and asking for money to flee the area, and, the occupants had harbored defendant who was found on the couch after fleeing the scene of a

A-0928-20

shooting. However, we also recognize that the officers each testified that they did not fear for their safety or suspect that accomplices were present, and police had secured the others in a separate area. Further, defendant was restrained and could have been removed from the couch to prevent any concern that he might access a hidden firearm. Significantly, the testimony universally confirmed the police "secured" the home, inside and out, and "froze" the scene. The exigency and imminent threat to safety had been lifted by the overwhelming police presence. Consequently, we cannot conclude that the State met its burden to show that police inquiry about the gun, prompting defendant's non-verbal pointing to the duffel bag, was proper.

Our inquiry does not end there, however, as we recognize the State never referenced defendant's nod toward the gun at trial. Accordingly, no prejudice resulted from the ruling that testimony about defendant's nod was admissible at trial, unless, as defendant asserts, the Miranda violation mandates suppression of the gun as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 487-88 (1963); see also State v. Johnson, 118 N.J. 639, 652 (1990). The State argues that the first motion judge's ruling—deemed law of the case by the trial court on remand—determined that lawful consent justified the warrantless

seizure of the gun, which would have been inevitably discovered as it sat in plain view regardless of defendant's nod.

Indeed, the motion judge denied suppression of the gun under the Fourth Amendment finding Thompson, who resided in and controlled the common areas of the home, freely and voluntarily gave consent to the search confirmed in writing. The testimony from responding officers, supported by photographs, demonstrated that the handle of the firearm was visible in plain view through a translucent bag protruding from the duffel bag located in the living room. Consequently, we conclude the gun would have been readily discovered during the subsequent valid consent search of the apartment. See State v. Robinson, 228 N.J. 529, 552 (2017) (explaining that "inevitable discovery" exception to warrant requirement derives from the principle that deterrent purposes of exclusionary rule are not served by excluding evidence that, but for misconduct, police inevitably would have discovered).[6]

---

[6] Accordingly, we need not reach the State's argument that a Miranda violation merits suppression of statements but does not extend to the "non-testimonial fruits" derived from the statements. See State in Int. of A.S., 227 N.J. Super. 541, 548 (App. Div. 1988) (holding when "[t]he gun was discovered . . . by [the defendant's] nontestimonial conduct of leading the police officers to the gun," there was "no violation of the Fifth Amendment—only a violation of the Miranda prophylactic rule—which is not a constitutional violation").

We next address defendant's claim that the court erred by admitting his pre-Miranda response to Detective Delaney's question of defendant: "[L]ook, is anything else in that [duffel] bag yours?" Defendant answered, "Nothing but the gun, and that's it." As defendant was undeniably in custody, we consider whether the statements resulted from police interrogation.

"[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). "[T]he term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301 (footnotes omitted). By contrast, "unexpected incriminating statements made by in[-]custody defendants in response to non-investigative questions by the police without prior Miranda warnings are admissible." State v. M.L., 253 N.J. Super. 13, 21 (App. Div. 1991).

Here both the first motion judge, and the trial court, found the police testimony credible. The detectives described gathering defendant's items for transport to the police station, when Detective Brazofsky held up the t-shirts and

CDs from the duffel bag, prompting Detective Delaney's asking defendant whether any of these items belonged to him. Detective Delaney made no reference to the gun. Defendant offered that "nothing but the gun" and his phone, which was on the couch, belonged to him. The trial court and the motion judge credited the detectives' testimony that this exchange, placed in context, was intended to identify defendant's property before transporting him from the apartment. The court, thus, deemed the detective's question "reasonable" and "ministerial" and "designed to ascertain what property belonged to . . . defendant, and not designed to elicit an incriminating response."

Although we believe the better practice in these circumstances would have been to refrain from posing any questions related to the duffel bag or its contents, we are not persuaded the trial court erred. The record supported the court's finding that defendant's incriminating response was unforeseeable and did not flow from police interrogation or its functional equivalent.

Alternatively, we are convinced that any error in admitting this statement at trial was harmless and not of "such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. The identity of the shooter was not a mystery; it was undisputed at trial that defendant shot Hall, and the gun was found five feet from him in the aftermath of the shooting. That defendant

A-0928-20

admitted to possessing the gun was not, as defendant suggests, "devastating" to his claim of self-defense. The statement, on its face, was open to interpretation and—as the defense aptly highlighted at trial—could have plausibly meant defendant admitted he possessed it at the time, as opposed to someone else in the apartment where it was discovered. Defense counsel vigorously argued the gun belonged to Hall who brought it to the Lowensteins' home and confronted defendant with it. Viewed in light of the strong evidence of defendant's guilt, including Kerilynn's eyewitness testimony, we perceive defendant's statement, even if admitted in error, does not warrant reversal.

We likewise perceive no error in the court's determining Detective Delaney's merely advising defendant during transport that police were bringing him to the police station to question him about a "shooting" amounted to interrogation. Police do not violate Miranda's requirements by informing defendants of the reasons for their detention. State v. Wright, 444 N.J. Super. 347, 366 (App. Div. 2016) (finding "officers' initial statements to [the] defendant about why he was being detained" was not functional equivalent of interrogation). The detective went no further and did not provide "updates on the progress of the investigation," likely to elicit an incriminating response. Id. at 367.

70

Regardless, even assuming for purposes of argument the detective should have refrained from providing even that basic information, we similarly find any error harmless. Defendant's response was simply, "I don't know anything about that." No inference from defendant's denying knowledge of a "shooting" warrants reversal of this conviction rooted in substantial evidence of his guilt.

### 2. Defendant's Post-Miranda Formal Statement

We next consider the court's admission of defendant's formal statement. "A defendant's statement to the police, made in custody, is admissible if it is given freely and voluntarily, after the defendant received <u>Miranda</u> warnings, and after he knowingly, voluntarily, and intelligently waived his rights." <u>O.D.A.-C.</u>, 250 N.J. at 413. Critically, "[t]he State must prove beyond a reasonable doubt that a defendant's waiver was valid," before any custodial statements made by a defendant may be used against him. <u>Ibid.</u>

Under New Jersey law, juveniles "receive heightened protections when it comes to custodial interrogations." <u>State in the Int. of A.A.</u>, 240 N.J. 341, 354 (2020). "'[T]he greatest care must be taken to assure that' a juvenile's admission is 'voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.'" <u>Ibid.</u> (quoting <u>In re Gault</u>, 387 U.S. 1, 55 (1967)).

71

We employ a fact-sensitive analysis in determining whether a juvenile's statement is knowingly, intelligently, and voluntarily provided. Relevant considerations in the "totality of circumstances surrounding the arrest and interrogation, includ[e] such factors as 'the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved,'" as well as the suspect's previous encounters with the law. State v. Presha, 163 N.J. 304, 313 (2000) (quoting State v. Miller, 76 N.J. 392, 402 (1978)).

Juvenile interrogees also have the right to have a parent or guardian present whenever Miranda warnings are administered. Id. at 322. Indeed, "the presence of a parent is a 'highly significant factor' in the totality of the circumstances analysis contemplated by Presha." State in the Int. of A.S., 203 N.J. 131, 154 (2010). As the Court held:

> The protections outlined in Presha remain good law. To reinforce them and avoid what took place here, we add the following guidance. The police should advise juveniles in custody of their Miranda rights—in the presence of a parent or legal guardian—before the police question, or a parent speaks with, the juvenile. Officers should then give parents or guardians a meaningful opportunity to consult with the juvenile in private about those rights.

72

[<u>A.A.</u>, 240 N.J. at 358.]

We recently emphasized a juvenile's ability to consult with a parent "weighs heavily" in the totality. <u>State in the Int. of M.P.</u>, 476 N.J. Super. 242, 301 (App. Div. 2023).

Defendant claims the trial court erred in admitting the statement because police did not afford defendant an opportunity to consult with his mother or advise either of the details of the "shooting," or that he could be charged with murder or attempted murder, or at a minimum aggravated assault and a related firearm offense. Here the trial court was satisfied that both defendant and his mother were properly advised of defendant's <u>Miranda</u> rights, and the police used "no coercive tactics . . . to elicit statements from . . . defendant or to have his mother consent to the interrogation." We see no basis to disturb that ruling.

We recognize that when "a complaint-warrant has been filed or an arrest warrant has been issued against a suspect whom law enforcement officers seek to interrogate, the officers must disclose that fact to the interrogee and inform him in a simple declaratory statement of the charges filed against him before any interrogation." <u>Sims</u>, 250 N.J. at 213. However, here, no complaints had been filed and the details of the encounter and the degree of Hall's injury remained uncertain. There was no evidence in the record to reflect that the

charges had been determined or complaints had been drawn or signed. Further, both defendant and his mother were informed that the inquiry was about a shooting—a clear indication of the seriousness of the situation. Defendant also knew he was found in possession of the gun.

We also acknowledge the record does not reflect defendant and his mother consulted prior to the questioning. Although that is an important factor, it is not dispositive. It slides on the scale of materiality depending on the balance with other factors. Here, defendant turned eighteen a month after this interrogation, and was on juvenile probation after significant prior involvement with the juvenile justice system. He and his mother—aware the questioning was about a shooting—were provided with defendant's rights, orally and in writing, and acknowledged those rights. Defendant elected to answer questions. As observed by the trial court, there was no indicia of compulsion, force, or deception by police. Accordingly, we see no basis to disturb the trial court's finding that defendant's statements were constitutionally obtained.

D. Prosecutor's Summation

We next address the related challenge defendant raises for the first time on appeal, arguing the prosecutor in summation improperly commented on his

right to remain silent.  Reviewing this claim through the lens of plain error, we disagree.  See R. 1:7-2; R. 2:10-2.

When not challenged before the trial court, an "error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached."  State v. R.K., 220 N.J. 444, 456 (2015).  "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial.  Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial at the time they were made."  State v. Timmendequas, 161 N.J. 515, 576 (1999) (citation omitted).

In assessing the propriety of the prosecutor's remarks, we do not review the statements in isolation but in the context of "the summation as a whole."  State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008) (citing State v. Carter, 91 N.J. 86, 105 (1982)).  Also, the challenged remarks are to be "viewed in the context of the entire record."  State v. Bey, 129 N.J. 557, 622 (1992).  In reviewing challenges to a prosecutor's remarks, we first determine whether misconduct occurred.  See State v. Frost, 158 N.J. 76, 83 (1999).  When prosecutorial misconduct is identified, reversal is not warranted unless the misconduct is so egregious that it deprived the defendant of a fair trial.  See

Timmendequas, 161 N.J. at 575. Prosecutors are "expected to make vigorous and forceful closing arguments to juries." Frost, 158 N.J. at 82. They "are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented." Ibid. Prosecutors are permitted to respond to arguments raised by defense counsel as long as they do not stray beyond the evidence. State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001).

Defendant challenges the prosecutor's comments suggesting if defendant's claims about Hall's possessing the gun "were really true, that would be something [defendant] would have said early and often, and he didn't, and that omission is damning. And the reason why he didn't say it is because it's not what happened." The prosecutor then added "that evidence is most clearly displayed in the letters he wrote to his sister one week after the murder, three days after he was charged with murder. That is damning. That omission speaks volumes because he knew . . . what he did."

Defendant also challenges the prosecutor's comments suggesting that defendant's comments to police regarding his whereabouts at the time of the murder and his presence in the apartment where he was arrested were untrue, positing, "[I]f there was really a fight, if there was really a confrontation, if there

was really [Hall] with a gun, here's a good time to explain that, you would think." The prosecutor highlighted that, when asked "why do you think you're here," defendant responded, "I really don't know. That's what I want to know. Why am I here?" The prosecutor then stated, "That's a lie. Why? Because consciousness of guilt. He knows why he's there and this is what he chose to say."

Undeniably, "[a] suspect has a right to remain silent while in police custody or under official interrogation, in accordance with his state law privilege against self-incrimination." State v. Muhammad, 182 N.J. 551, 558 (2005). Accordingly, "a suspect's silence while in custody, under interrogation, or 'at or near' the time of his arrest cannot be used against him in a criminal trial." Ibid. "Making reference at trial to what a defendant did not say to the police is commenting on his silence." Id. at 565. This applies to a defendant's silence "whether or not that defendant had received his/her Miranda warnings." State v. Jenkins, 299 N.J. Super. 61, 67 (App. Div. 1997).

Further, "[a] suspect who begins to speak to the police while in custody, during interrogation, or 'at or near' the time of his arrest does not waive his right against self-incrimination when he falls silent—the words he could have spoken cannot be used against him." Muhammad, 182 N.J. at 568. Critically, however,

when a defendant has elected to speak, the State may point out inconsistencies in the prior statement and his claims at trial.

Here, defendant elected to speak to police and offered (1) he had not been to the Lowenstein house the night of the shooting, (2) he knew nothing about a shooting, and (3) the gun was his. Antithetical to those statements, his theory at trial (1) placed him at the Lowenstein house at the time of the offense, (2) conceded he shot Hall in self-defense, (3) and claimed he did so with Hall's gun. Thus, the prosecutor's comments on defendant's voluntary statements were not improper comments on silence; they were fair contrasts of defendant's prior inconsistent statements with his trial theory.

Further, placed in context, defense counsel argued in summation that defendant's statements to police regarding the gun meant only that he possessed Hall's gun after taking it from the shooting scene. Significantly, defense counsel emphasized that defendant's formal statement ended when defendant was talking about the gun, intimating that defendant was about to explain his innocence regarding the gun. Defense counsel's own reference to defendant's silence, preceding the prosecutor's comments, invited comparison to his prior statements. Jenkins, 299 N.J. Super. at 68 (finding prosecutor's comment on "post-arrest silence ordinarily would be improper" during summation, but the

defendant "opened the door" by suggesting he had not been given the opportunity to explain what occurred).

Under these circumstances, and under review for plain error, we conclude the prosecutor's comments were invited and reasonable, and did not constitute conduct "so egregious as to deprive defendant of a fair trial." State v. Williams, 244 N.J. 592, 608 (2021) (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

E.  Post-Verdict Juror Inquiry

We next address and reject defendant's argument that the trial judge's failure to voir dire the jury after a juror contacted the court following the verdict to express personal discomfort based on the juror's own post-trial research was error requiring reversal.

It is well-settled that "under no circumstances may post-verdict discussions occur between the court and discharged jurors, unless those discussions are part of a hearing ordered on good cause shown pursuant to Rule 1:16-1." Davis v. Husain, 220 N.J. 270, 274 (2014). Rule 1:16-1 provides, "[e]xcept by leave of court granted on good cause shown, no attorney or party shall . . . interview, examine, or question any . . . juror with respect to any matter relating to the case." Indeed,

> [i]f verdicts could be easily set aside as a result
> of an investigation into secret jury deliberations,

79

disappointed litigants would be encouraged to tamper with jurors, to harass them and to employ fraudulent practices in an effort to induce them to repudiate their decisions. Moreover, an open invitation would be extended to any disgruntled juror who might choose to destroy a verdict to which he had previously assented.

[State v. Athorn, 46 N.J. 247, 250 (1966).]

Whether there is good cause to permit the post-verdict interrogation of jurors pursuant to Rule 1:16-1 is a question of law reviewed de novo. See State v. Griffin, 449 N.J. Super. 13, 18-19 (App. Div. 2017). However, "an appellate tribunal must defer to the factual findings of the trial court when that court has made its findings based on the testimonial and documentary evidence presented at an evidentiary hearing or trial. Deference is also not confined simply to credibility findings." Hubbard, 222 N.J. at 269.

In March 2020, after the jury was discharged, a former juror called the trial judge's chambers "to speak with someone about her experience as a [j]uror on a recent case." The matter was referred to the Trial Court Administrator, who returned the juror's call and memorialized the conversation in writing. The juror advised that she followed instructions and had done no research on the case while sitting on the jury. She advised that "after the case was over" she did search the case "online" and found evidence that was not presented at trial including information that a witness was a "gang member from Newark who had

a gun in the basement where the victim was. Also, the witness had shot a gun before." She advised that she "regrets not knowing the background of the witness."

The trial judge held a hearing and read the memorandum summarizing the juror's statements. Defense counsel requested that the court "bring [the juror] in for a limited inquiry" into "whether certain extraneous materials or extraneous forces were at work in the jury room." Counsel further asked that the court "bring in this juror for the limited inquiry of trying to find out whether the Rule 404(b) evidence was somehow misread or misunderstood."

The court denied defendant's request determining:

> Clearly [the former juror] said she did not do any research, she followed my direction, no research, no newspapers. And now, after the verdict, she went on[]line and researched the case.
>
> . . . .
>
> Counsel, your application is denied. There is absolutely[,] under the case law[,] no reason to bring this juror back into the courtroom. . . .
>
> . . . .
>
> Under no circumstances may a post-verdict discussion occur between the [c]ourt and discharged jurors unless those discussions are part of a hearing ordered on good cause shown pursuant to Rule 1:16-1. Calling back a jury for questioning following

81

discharge . . . [is] to be utilized only upon a strong showing that a litigant may have been harmed by jury misconduct. There is absolutely no showing of jury misconduct.

The trial judge's ruling was correct and supported by the record and case law. We discern no error in the court's adherence to the vital prohibition on post-verdict interrogation of jurors or intrusion into their protected deliberative process. Defendant's arguments that pretrial rulings needlessly painted defendant in a bad light while simultaneously "spit shin[ing]" Hicks and "polish[ing] up" Hall in front of the jury, without more, similarly fail. Defendant may be correct that "[i]f they were gang members, that would affect how defendant perceived the events of that fatal night," but he offers no evidence warranting rare post-verdict probing into the jury's deliberations.

F. Admission of Forensic Report

Defendant argues, for the first time in a self-represented supplemental brief, that his right to confrontation was violated by admitting and allowing expert testimony based on a State Police forensics report prepared by a deceased non-testifying witness, citing Crawford v. Washington, 541 U.S. 36 (2004). The State argues that defendant waived his confrontation rights when defense counsel failed to object to admission of the report.

82

The forensic report at issue is "testimonial" and, therefore, the type of document subject to the Confrontation Clause. See State v. Michaels, 219 N.J. 1, 6 (2014). However, we conclude that by failing to raise the challenge at trial, defendant waived this claim.

Both the Federal and State Constitutions guarantee that, in a criminal trial, the accused has the right "to be confronted with the witnesses against him." U.S. Const. amend VI; N.J. Const. art. I, § 10. The Confrontation Clause "prohibit[s] the use of out-of-court testimonial hearsay, untested by cross-examination, as a substitute for in-court testimony." State in the Int. of J.A., 195 N.J. 324, 342 (2008).

"The right of confrontation, like other constitutional rights, may be waived by the accused." State v. Williams, 219 N.J. 89, 98 (2014). Because a criminal defendant is not compelled to insist that the State call a live witness who might do damage to his or her case, "[t]he defendant always has the burden of raising his Confrontation Clause objection." Melendez-Diaz v. Massachusetts, 557 U.S. 305, 327-28 (2009) ("It is unlikely that defense counsel will insist on live testimony whose effect will be merely to highlight rather than cast doubt upon the forensic analysis."). "It is the defendant's choice 'to assert (or forfeit by silence) his Confrontation Clause right.'" Williams, 219 N.J. at 99 (quoting

<u>Melendez-Diaz</u>, 557 U.S. at 326).

Defendant did not contest the admission of the report or the related testimony; his counsel cross-examined the State's experts regarding the contents. Although his challenge is thus waived, for completeness, we perceive no error in the testimony that was presented at trial related to the report. Importantly, "a defendant's federal and state confrontation rights are satisfied so long as the testifying witness is qualified to perform, and did in fact perform, an independent review of testing data and processes, rather than merely read from or vouch for another analyst's report or conclusions." <u>State v. Roach</u>, 219 N.J. 58, 61 (2014); <u>see also</u> <u>Michaels</u>, 219 N.J. at 45-46 (in the context of blood test results, "a truly independent reviewer or supervisor of testing results" may testify about the results if the reviewer "is knowledgeable about the testing process, has independently verified the correctness of the machine-tested processes and results, and has formed an independent conclusion about the results").

At trial, the State called as experts Edward Rankin Gainsborg, Jr. and Lieutenant James Ryan, regarding the report and their findings referencing the report. Gainsborg, the trace evidence supervisor at the New Jersey State Police, Office of Forensic Sciences, was accepted as an expert in trace evidence analysis

and had performed an administrative review of the testing related to the gunshot residue on Hall's shirt. As part of his administrative review, Gainsborg reviewed the technician's report and concurred with its findings regarding the spread of the residue.[7] He testified that he reviewed all aspects of the testing process and conducted an independent observation and analysis and formed his own conclusion. He explained that his review entailed: "Reviewing the notes, the diagrams, and the photographs, and determining that everything was done properly and then agreeing with it," which was done "to maximize the level of accuracy in these test[s]."

The State also called Lieutenant Ryan of the Ballistics Unit of the New Jersey State Police, who was accepted as an expert in firearms tool mark identification. Ryan explained that he test-fired the weapon and compared his results to the results contained in the forensics report. Comparing the spread on the transparencies from his test shots with those contained in the report, Ryan determined that the handgun was fired from "a muzzle to garment distance of greater than six inches, but less than [twenty-four]."

---

[7] The technician who authored the report passed away before trial.

Given the independent review performed by these experts, we are satisfied defendant's confrontation rights were not violated when the report was admitted, referenced, and relied upon by the testifying experts.

G. <u>Sentencing Challenges</u>

Finally, defendant challenges his sentence, claiming errors necessitate a remand for resentencing. Specifically, defendant argues: (1) the sentencing court failed to properly consider the significance of his youth before imposing the sentence; (2) the sentencing court failed to state whether the imposition of consecutive terms was overall fair, in violation of <u>State v. Torres</u>, 246 N.J. 246 (2021); and (3) his de facto life sentence, without parole, constitutes cruel and unusual punishment.

The standard of review is "one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of "second guessing."'" <u>State v. Dalziel</u>, 182 N.J. 494, 501 (2005) (alteration in original) (quoting <u>State v. Megargel</u>, 143 N.J. 484, 494 (1996)); <u>see also</u> <u>State v. Miller</u>, 205 N.J. 109, 127 (2011) ("Appellate review of the length of a sentence is limited."). A sentence must be upheld when the "trial court has made findings of fact that are grounded in competent, reasonably credible evidence and [when] 'the factfinder [has] appl[ied] correct legal

principles in exercising its discretion.'" State v. Blackmon, 202 N.J. 283, 297 (2010) (second and third alterations in original) (quoting State v. Roth, 95 N.J. 334, 363 (1984)). "The reviewing court must not substitute its judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014).

The record reveals the sentencing court properly considered defendant's youth. Indeed, defendant concedes that the sentencing court "did conduct an analysis of the [applicable] case law," citing to Miller v. Alabama, 567 U.S. 460 (2012), and State v. Zuber, 227 N.J. 422 (2017). However, he argues that the court's analysis "ignores that these incidents were a result of [defendant]'s youthfulness, and ignores all the scientific findings regarding immature brain development." This claim is belied by the record.

The sentencing court performed a proper and thorough analysis of Miller and Zuber, explaining:

> Analyzing the factors in Miller and Zuber, there is scant evidence or information that would lead this [c]ourt to consider that . . . defendant was immature, impetuous, did not understand the gravity of his conduct. He was well aware of his conduct and attempted to cajole and threaten witnesses. He pretended to be mentally ill. He was not subject to peer pressure. And after he was incarcerated, then he indicated that he was a member of the Latin Kings. He became a member of the Latin Kings after his incarceration.

87

He did not have contact with his father for five years, but had the love of his mother and his siblings. He ignored the rehabilitation efforts provided to him though the juvenile justice system. He had problems with authority as evidenced in his history of a [violation of probation] and resisting. He ignored the efforts of [the] Lowenstein[s] to better himself. While . . . the Lowensteins tried to help . . . defendant[,] he beat their daughter. There is nothing in the record before this [c]ourt to indicate that . . . defendant had any intellectual limitations that would prevent him from dealing with his own attorney.

The sentencing court further explained:

I have considered the factors set forth in Miller v. Alabama, directing this [c]ourt to consider potential mitigating qualities of youth when sentencing a juvenile to life imprisonment without the possibility of parole. I also acknowledge that in State v. Zuber the New Jersey Supreme Court advised . . . the sentencing court—that the Miller factors should also apply when a juvenile's sentence constitute[s] the functional equivalent to life imprisonment without parole.

I feel compelled to accept the State's recommendation to sentence . . . defendant to a life sentence. There are no mitigating factors that lead this [c]ourt to believe that . . . defendant can be rehabilitated, rather I find that he is irreparably corrupted.

Plainly, the court fairly considered defendant's youth in imposing the sentence.

Similarly, the court properly considered the overall fairness of consecutive sentencing. In considering whether to impose consecutive sentences, the court noted:

> Zuber instructs the [c]ourt to consider Miller factors along with the factors set forth in . . . [State v.] Yarbough, [100 N.J. 627 (1985),] when considering whether to impose multiple consecutive sentences on juveniles which would result in a lengthy prison term, the functional equivalent to life imprisonment without parole, which would take into account how children are different and how these differences counsel against irrevocably sentencing children to a lifetime in prison.
>
> The Supreme Court recognized the mitigating qualities of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, family and home environment, family and peer pressures, and inability to deal with police officers or prosecutors or the juvenile's own attorney, and the possibility of rehabilitation.

The sentencing court analyzed the Yarbough factors and determined that the imposition of a consecutive term of four years on top of the life sentence for murder was appropriate.

The sentencing findings were thorough and sufficient to support the consecutive sentence. The court determined the firearms possession and the hindering offenses were separate crimes, with different objectives, at separate times, and thus determined the custodial terms for those offenses should run

89

consecutively. The court found the consecutive sentence appropriate as the crimes were "committed at different times and at separate places and were not committed so closely in time and place to indicate a single period of abhorrent behavior." We note <u>Torres</u> was decided after defendant was sentenced in this matter. Because <u>Torres</u> did not announce a new rule of law and simply reemphasized the longstanding requirement that a sentencing court address the overall fairness of a consecutive sentence, it does not require retroactive application. <u>See</u> <u>State v. Burstein</u>, 85 N.J. 394, 403 (1981) (stating "retroactivity can arise only where there has been a departure from existing law").

Regarding defendant's constitutional claim that his de facto life sentence, without parole, constitutes cruel and unusual punishment, the Court in <u>State v. Comer</u>, 249 N.J. 359 (2022), "created a procedure for juvenile offenders sentenced to the murder statute's mandatory [thirty]-year parole bar to petition the court for a hearing after" serving at least twenty years in prison for the sentencing court to assess the <u>Miller</u> factors. <u>State v. Thomas</u>, 470 N.J. Super. 167, 196-97 (App. Div. 2022). As the State concedes, "the procedure[s] set forth in . . . <u>Comer</u> . . . must be applied to defendant's sentence." Accordingly, defendant will have a meaningful opportunity to seek resentencing, and his is not a de facto life sentence.

We perceive no error, singularly or cumulatively, at trial or in sentencing, warranting reversal.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-0928-20